IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TREMEIN HOSKINS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civ. No. 14-1409-SLR |
| | ) | |
| DAVID PIERCE, Warden, and | ) | |
| ATTORNEY GENERAL OF THE | ) | |
| STATE OF DELAWARE, | ) | |
| | ) | |
| Respondents. | ) | |

_____

Daniel I. Siegel, Esq.  Assistant Federal Public Defender, Office of the Federal Public Defender for the District of Delaware.  Counsel for petitioner.

Gregory Smith.  Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.  Counsel for respondents.

_____

**MEMORANDUM OPINION**

November  16 , 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Presently before the court is petitioner Tremein Hoskins' ("petitioner") pro se application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and his counseled opening brief in support (hereinafter singularly referred to as "application"). (D.I. 1; D.I. 27) The State filed an answer in opposition to the pro se application and a memorandum in opposition to the counseled brief. (D.I. 14; D.I. 29) For the reasons that follow, the court will dismiss the application.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The facts leading to petitioner's arrest and convictions are presented below, as set forth by the Delaware Supreme Court in petitioner's direct appeal:

> Late one September evening, fifteen to twenty people were socializing outside of a community known as Capital Green in Dover. The group was "just standing out there talking, having fun." Music could be heard playing from one of their cars. The group included Brandon Beard, Leia Tolson, Jermaine Brown, Lentia Brown, Ashley Walton, and Lisa Moaney.
>
> Meanwhile, less than two miles away in a residential area known as Capitol Park, another group of individuals was preparing to make the short trip to Capital Green. That group included [petitioner], Brett Hoskins, Darryl Copperhead, and Alonzo West. Those four men got into West's burgundy Buick. West drove the car, [petitioner] sat next to him in the front passenger seat, and Brett Hoskins and Copperhead sat in the back of the car. The group stopped at a nearby Royal Farms to get gas and continued on to Capital Green.
>
> Shortly thereafter, Leia Tolson observed at least two vehicles approach the crowd at Capital Green. First, a Jeep Cherokee drew near, and then a burgundy Buick "slowed down in front of [the crowd]" and "the person in the back seat rolled their window down." At that time, Tolson knew "something wasn't right," and that "some shots or something was going to get fired because of the way the cars [ ] came in at that time of night; you don't usually see cars come in like that." The cars parked one behind the other, not far from the crowd. Then, Tolson "just heard gunshots" coming from "where the cars had parked at." Although it is

unclear how many shots were fired that night, Tolson heard "at least fifteen gunshots." Tolson and the others then started to run to Lisa Moaney's nearby house.

Tolson looked back "to make sure that [they] didn't leave anybody outside." She saw Brandon Beard "on his knees; and he was holding his chest with one of his arms out." Tolson and a friend then carried Beard into Moaney's house and laid him on a couch. Beard "patted his chest" and informed his friends that he had been hit. Then, Tolson observed "the blood just [ ] coming through his sweats." Tolson called 911 from her cell phone. Beard stated, "I can't breathe." Beard then told his friends: "[c]all my mom" and "[d]on't leave me." Beard repeatedly stated: "I am going to die" and "[t]ake care of my kid." Shortly thereafter, paramedics arrived and transported Beard to nearby Kent General Hospital. Dr. Samuel Wilson, who was on call that night, received a page and reported to the hospital. Doctors began operating on Beard at approximately 2:00 a.m., but they were unable to save him. Beard was pronounced dead at 5:36 a.m. Doctor Judith Tobin identified the cause of death as "irreversible shock due to massive hemorrhage due to a gunshot wound to the left lung and the left subclavian vein." Tobin opined that Beard "had his back to where the bullet came from."

Later that day, Detective Robert Roswell interviewed [petitioner]. First, [petitioner] told Roswell that he was not at Capital Green when Beard was shot. Later in that interview, he recanted and admitted that he was at Capital Green, but stated that he did not see the shooting. During that interview with [petitioner], Roswell learned that [petitioner] and Brett Hoskins were in a burgundy Buick on the night of Beard's death and that a man named "Lonny" supposedly drove the car.

Two days later, Roswell and another detective drove to Capitol Park, where they believed "Lonny" resided. As they approached the entrance to the development, Roswell saw a burgundy Buick pulling out of the Capitol Park entrance. Roswell stopped the vehicle and its driver, Alonzo West. Roswell searched the vehicle, with West's consent, but found nothing related to the homicide. West arrived at a nearby police station approximately thirty minutes later and voluntarily discussed the events of the night in question. West stated that he was playing pool with friends earlier during the night of the shooting and that he had drank one beer. He also stated that he went to various liquor stores in Dover and then returned to Capitol Park. When asked who got into West's car later that night to go to Capital Green, West replied: "Well, Copperhead, as we call him, and me and [petitioner]. And that is it." West then admitted that he owned a Ruger 9mm, but that neither he nor Copperhead exited the vehicle or fired a gun that night. But, West stated that [petitioner] used his gun:

2

Detective: So, who did you let use your gun? Was it somebody in your car?

West: Hm, yeah.

Detective: Which one?

West: Ah, [petitioner].

Detective: Ok, now afterwards, does he give it back to you?

West: Well, yeah.

Detective: All right. Does he get out and shoot, or does he shoot out the window, or what?

West: Hm, got out.

Detective: How many times you figure he shot?

West: Who?

Detective: [petitioner].

West: Could only shoot five rounds.

At the end of the interview, Roswell obtained West's consent to retrieve the Ruger 9mm from West's girlfriend's trailer. Roswell found a blue gym bag, which contained a gun case. That gun case contained a Ruger 9mm handgun. The Ruger 9mm contained a magazine, but no bullets. Roswell also found a receipt for the Ruger 9mm that identified West as its purchaser. The gym bag also contained, among other things, "a Wal–Mart bag with a box of .22–caliber bullets, a 50–count box, and all the bullets were in the box."

Roswell then interviewed [petitioner] again. In that interview, [petitioner] finally admitted that he fired West's gun on the night of Beard's death, but [petitioner] did not describe the type of gun he fired. In his previous interview, [petitioner] had denied even observing the shooting. [Petitioner] explained his recantation as follows: "I didn't know what was going on yet. I didn't know what was what. I am not—that's something that I don't do all the time, so I wasn't involved in anything like that on any other occasion."

Back at the scene of the crime, police recovered twelve spent shell casings. Carl Rone of the Delaware State Police Forensic Firearms Service Unit determined

3

that seven were fired from one gun and five were fired from another. When police recovered those spent shell casings, the group of five and the group of seven were approximately twelve to fifteen feet apart. Rone determined that all were fired from 9mm handguns. No .22-caliber casings were found. Rone analyzed test rounds fired from the Ruger 9mm that Roswell recovered from West's residence and determined that the bullet that killed Beard had been fired from that Ruger 9mm. Rone also determined that of the twelve shell casings that were recovered from the crime scene, five matched West's Ruger 9mm.

There was additional forensic evidence, but it proved inconclusive. Corporal Marc Gray found one fingerprint on the magazine of West's Ruger 9mm. The fingerprint was on the middle of the magazine, so it likely resulted from that person either loading the magazine with bullets or loading the gun with the magazine. Police determined that the fingerprint did not match [petitioner's] fingerprint.

Approximately one year after his first statement to police, West gave a second interview in connection with a plea. He stated: "[Petitioner] asked me yo can you go get you um get you um get your gun. I got you this and that. He asked me about 3 or 4 times so." West confirmed that he drove the burgundy Buick that night and stated that "[petitioner], Brett, and um Copperhead was in the car," but when they stopped at Royal Farms, "Brett got out the car and jumped [ ] in the Jeep." West stated that he followed a Jeep into Capital Green and the following occurred:

> [The Jeep] was like little bit behind me I mean I was like here may been on the other side like little back in back or whatever and then me [ ] [petitioner] and Copperhead were sittin in the car then um next thing we was talking next thing we heard uh was bop bop bop then [petitioner] jumped out the car he grabbed the gun, jumped out the car me and Copperhead stayed in the car and then when uh when I heard shots (unintelligible) you know what I mean (unintelligible).

West stated that the group then returned to Capitol Park, discussing what had just occurred. West recalled:

> Yeah and um um Brett and um (unintelligible) about something and (unintelligible) said um about mentioned about um yeah I shot up in the air whatever something like that. Didn't nobody shoot up in the air. Then um Brett said um pointed to what 2 or 3 people you all see what I done right. You see what I done. You see what I done.

*Hoskins v. State*, 14 A.3d 554, 556-59 (Del. 2011).

4

Dover police arrested petitioner in September 2008, and he was indicted on the following charges in November 2008: first degree murder, attempted first degree murder, two counts of first degree reckless endangering, first degree conspiracy, and four counts of possession of a firearm during the commission of a felony ("PFDCF"). (D.I. 14 at 6)  In October 2009, a Delaware Superior Court jury found petitioner guilty of all four counts of PFDCF, two counts of reckless endangering, and a third count of reckless endangering as a lesser included offense of attempted murder. *Id.* The jury was unable to reach a verdict for the murder and conspiracy charges. On November 30, 2009, the State dismissed the conspiracy charge, and announced that it would only re-try petitioner on the lesser-included-offense of second degree murder. *Id.* In December 2009, a Superior Court jury found petitioner guilty of second degree murder. He was sentenced in January 2010 to a total non-suspended period of forty-three years and nine months of imprisonment. *Id.* The Delaware Supreme Court affirmed petitioner's convictions and sentence on direct appeal. *See Hoskins*, 14 A.3d at 556.

In January 2012, petitioner filed a motion for post-conviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"). (D.I. 14 at 7)  The Superior Court denied the motion, and the Delaware Supreme Court affirmed that judgment on post-conviction appeal. *See Hoskins v. State*, 102 A.3d 724 (Del. 2014).

Petitioner timely filed a *pro se* § 2254 application in this court asserting four claims: (1) the trial court failed to give an accomplice credibility jury instruction; (2) the trial court failed to give a single theory unanimity jury instruction; (3) the trial court improperly admitted West's out-of-court statements pursuant to 11 Del. C. § 3507

5

without requiring the State to ask necessary foundational questions; and (4) defense counsel provided ineffective assistance by failing to request an accomplice credibility jury instruction and a single theory unanimity jury instruction, and by failing to object to the admission of West's out-of-court statements. The State filed a response in opposition. (D.I. 14) Thereafter, the court granted petitioner' motion for representation by counsel and appointed the federal public defender's office to represent him. (D.I. 22) Petitioner then filed an opening brief in support of his original pro se application. (D.I. 27) The State filed a memorandum in opposition (D.I. 29), and petitioner filed a reply brief (D.I. 30).

## III. STANDARD OF REVIEW

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d).  Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial.  28 U.S.C. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).

A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground.  *Thomas v. Horn*, 570

6

F.3d 105, 115 (3d Cir. 2009).  The deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied"; as explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 98-100 (2011).

Finally, when reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct.  28 U.S.C. § 2254(e)(1).  This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003)(stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## IV. DISCUSSION

In its answer to petitioner's original *pro se* habeas application, the State contends that claims one, two, and three should be denied as procedurally barred, and that claim four, an ineffective assistance of counsel claim with three sub-arguments, should be denied for failing to satisfy § 2254(d).  (D.1. 14)  After the State filed its answer, the court appointed the federal public defender's office to represent petitioner in this proceeding.  The assistant federal public defender filed a brief in support of petitioner's pro se application.  (D.I. 27)  The brief in support does not mention the three procedurally barred claims.  Rather, it states that, "[i]n his federal post-conviction

7

[application], [petitioner] again raised the three [ineffective assistance of counsel] claims that were raised in his state post-conviction petition." (D.I. 27 at 10) Petitioner's brief in support also states that "[t]his brief will discuss claim one [which is really sub-argument one in claim four of petitioner's original application], which argues that [petitioner] was prejudiced by trial counsel's deficient performance in failing to request an accomplice instruction. On claims two and three [which are really sub-arguments two and three in claim four of petitioner's original application], counsel will rely on petitioner's pro se filing." (D.I. 27 at 10) Given these circumstances, the court concludes that petitioner has: (1) withdrawn claims one, two, and three that were asserted in his original application; (2) decided to proceed with the remaining ineffective assistance of counsel claim (original claim four) which contains three sub-arguments; (3) supplemented the first ineffective assistance of counsel sub-argument regarding counsel's failure to request an accomplice instruction; and (4) decided to rely on petitioner's original presentation of the remaining two ineffective assistance of counsel sub-arguments. Therefore, the court views petitioner's application as presenting the following three claims: (1) defense counsel provided ineffective assistance by failing to request an accomplice credibility jury instruction; (2) defense counsel provided ineffective assistance by failing to request a single theory unanimity jury instruction; and (3) defense counsel provided ineffective assistance by failing to object to the admission of West's out-of-court statements. The Delaware Supreme Court denied these ineffective assistance of counsel claims on post-conviction appeal after determining that the arguments lacked merit. Hence, habeas relief will only be available if the Delaware

8

Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The clearly established Supreme Court precedent governing ineffective assistance of counsel claims is the two-pronged standard enunciated by *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. Under the second *Strickland* prong, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's error the result would have been different." *Id.* at 687-96. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* at 688.

In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir.1987). Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable." *Strickland*, 466 U.S. at 689.

Turning to the first prong of the § 2254(d)(1) inquiry, the court notes that the Delaware Supreme Court correctly identified the *Strickland* standard applicable to the instant claims. Thus, the Delaware Supreme Court's decision was not contrary to *Strickland*. *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision

9

applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

The court's inquiry is not over, however, because it must also determine if the Delaware Supreme Court reasonably applied the *Strickland* standard to the facts of petitioner's case. When performing this inquiry, the court must review the Delaware Supreme Court's decision with respect to petitioner's ineffective assistance of counsel claims through a "doubly deferential" lens.[1] *Richter*, 562 U.S. at 105. Notably, when § 2254(d) applies, "the question is not whether counsel's actions were reasonable, [but rather], whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* When assessing prejudice under *Strickland*, the question is "whether it is reasonably likely the result would have been different" but for counsel's performance, and the "likelihood of a different result must be substantial, not just conceivable." *Id.* Finally, when viewing a state court's determination that a *Strickland* claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101.

---

[1] As explained by the *Richter* Court,

> [t]he standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).

*Richter*, 562 U.S. at 105 (internal citations omitted).

10

## A. Claim One: Counsel Failed To Request An Accomplice Credibility Instruction

In *Bland v. State*, the Delaware Supreme Court held that a jury must be

instructed to use great caution when weighing uncorroborated accomplice testimony.

*See Bland v. State*, 263 A.2d 286, 288-90 (Del. 1970). In his Rule 61 proceeding,

petitioner argued that defense counsel was ineffective for failing to request a *Bland* jury

instruction regarding the credibility of West's accomplice testimony. The Superior Court

denied this argument as meritless. (D.I. 16, *State v. Hoskins*, No. 080901884, Order

(Del. Super. Jan. 28, 2014) On post-conviction appeal, the Delaware Supreme Court

concluded that defense counsel provided deficient performance by failing to request a

*Bland* accomplice credibility jury instruction, but held that petitioner was not prejudiced

by defense counsel's deficient performance. Specifically, the Delaware Supreme Court

opined:

> Even though [defense] counsel's failure in this case to request a *Bland* instruction was deficient, [petitioner] has not shown prejudice under the second prong of *Strickland*. The record shows that there was not a reasonable likelihood that the result at trial would have been different if trial counsel had requested a *Bland* instruction, and the trial judge had given one.
>
> There was substantial evidence other than West's testimony that was presented at trial to convict [petitioner]. [Petitioner] himself admitted to being in West's Buick and getting out of the vehicle at the scene of the crime. [Petitioner] confessed to shooting a gun given to him by West. Further, ballistic evidence showed that the bullet that killed Brandon Beard was fired from West's Ruger 9mm. Also significant was the absence of the .22 caliber gun that [petitioner] claims he fired on the night of the homicide. Only 9mm shell casings were found at the scene of the crime and no .22 caliber revolver was ever recovered. No one, including [petitioner], testified that anyone else in West's Buick fired a gun. Because West's testimony was independently corroborated, [petitioner] has not shown prejudice, and his first ineffective assistance claim fails under *Strickland*.

*Hoskins*, 102 A.3d at 732-33.

11

In this proceeding, petitioner contends that the Delaware Supreme Court's decision regarding prejudice was based on an unreasonable application of *Strickland*, because the Delaware Supreme Court did not consider the following evidence when holding that counsel's failure to request an accomplice instruction did not prejudice petitioner: (1) petitioner's testimony that he shot the gun into the air; (2) the testifying eyewitnesses did not identify petitioner as the shooter; (3) a detective's testimony that two eyewitnesses who were shown petitioner's picture in photographic lineups identified someone else as the shooter; (4) West's arguable interest in securing a reduced sentence; and (5) the existence of a fingerprint on the magazine of the 9mm pistol that did not match petitioner's fingerprint. (D.I. 27 at 6) Given his belief that § 2254(d)(1) has been violated, petitioner asserts that the court must review claim one de novo, and cites *Branch v. Sweeney*, 758 F.3d 226, 233 (3d Cir. 2014),[2] to support this contention.

In contrast, the State contends that the Delaware Supreme Court's decision regarding prejudice must be reviewed under § 2254(d)(1)'s deferential standard, because de novo review in habeas cases is "only available when the prisoner presented his claim to the state's courts, but those courts refused to adjudicate the claim at all or did so under the wrong standard. The State cites *Cullen v. Pinholster*, 563 U.S. 170, 202 (2011) to support this contention. (D.I 29 at 2)

The court is not persuaded by petitioner's argument. As the State contends, according to clearly established Supreme Court precedent (rather than Third Circuit

_____

[2]In *Branch*, the Third Circuit held that federal courts must apply a de novo standard of review when a state court decision was "contrary to" or an "unreasonable application " of a controlling Supreme Court precedent.

precedent), de novo review is appropriate when the state court decision does not reach a question that was presented to it. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Porter v. McCollum*, 558 U.S. 30, 39 (2009). Here, since the Delaware Supreme Court reached the issue of prejudice with respect to claim one, it would appear that de novo review is inappropriate.

Additionally, even *Branch* does not support petitioner's position. The *Branch* Court's conclusion that it had to review an ineffective assistance of counsel claim under a de novo standard was based on the *Branch* Court's review of the **record before it** and its determination that the **record** did not support the state court's decision that defense counsel's performance was not deficient. *See Branch*, 758 F.3d at 234 (emphasis added). Since the record did not support the state court's decision, the *Branch* Court concluded that the state court had unreasonably applied *Strickland*. Indeed, as explained in *Strickland*, when assessing prejudice, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

Here, after reviewing the record that was before the state court in petitioner's case, the court is not persuaded by petitioner's unsupported contention that the Delaware Supreme Court did not consider the totality of the evidence. The fact that the Delaware Supreme Court's post-conviction appeal decision only lists the evidence it viewed as being "substantial" and supportive of petitioner's conviction does not necessarily mean that the identified evidence was the only evidence the Delaware Supreme Court considered when conducting its prejudice analysis. Notably, nothing in *Strickland* or *Branch* requires an explicit listing of all the evidence considered; rather,

13

these two cases focus on the content of the record considered by the state courts when reaching its decision. The record here shows that the evidence petitioner identifies in numbers one, two, three, and five set forth above was presented to the jury during the trial, and also to the three-judge-panels presiding over petitioner's direct appeal and post-conviction appeal. For instance, the appendix on direct appeal contains a trial transcript of defense counsel's opening statement, in which defense counsel asserts that "witnesses interviewed by the police implicate other suspects. You're going to hear from a couple of witnesses who were eye witnesses who were there at the scene who ID'd from a photo lineup someone else as the killer of Brandon Beard." (D.I. 16, Appellant's App. in *Hoskins v. State*, No. 98,2009, at A-13) Second, the appendix to petitioner's opening brief on post-conviction appeal reveals that the Delaware Supreme Court was explicitly presented with the evidence contained in numbers one, two, and five set forth above. (D.I. 16, App. to Appellant's Op. Br. in *Hoskins v. State*, No. 71, 2014, at A2, A60) Third, as for "West's arguable interest in securing a reduced sentence" because West had already pled guilty to second degree murder but had not yet been sentenced when he testified (item number four), the trial transcript also contains West's direct testimony that he entered into a plea agreement "with the State a couple weeks ago." (D.I. 16, Appellant's App. in *Hoskins v. State*, No. 98,2009, at A-14) Finally, two of the three judges who presided over petitioner's direct appeal (Justice Holland and Justice Ridgely) also presided over petitioner's post-conviction appeal.[3] Given this record, the court cannot conclude that the Delaware Supreme Court failed to

---

[3]Justice Jacobs was the third judge who presided over petitioner's direct appeal and Justice Strine was the third judge who presided over petitioner's post-conviction appeal.

14

consider the five factors set forth by petitioner as part of the totality of the evidence when it determined that petitioner was not prejudiced by defense counsel's failure to request an accomplice instruction. Accordingly, the court will review the Delaware Supreme Court's decision regarding prejudice under § 2254(d)(1)'s deferential standard.

To reiterate, when considering the prejudice prong of *Strickland*, a court must evaluate the effect of counsel's inadequate performance in light of the totality of evidence at trial. Here, the totality of the evidence presented at trial includes the following: (1) West was the only witness who testified that petitioner fired the 9mm gun that killed Brandon Beard; (2) none of the other eyewitnesses who testified during the trial could identify the shooter; (3) a police detective testified that two other eyewitnesses who were shown pictures of petitioner identified someone else as the shooter; (4) West pled guilty to second degree murder and first degree conspiracy weeks before testifying at petitioner's first trial; (5) the fingerprint on the magazine of the 9mm gun that was used to shoot Beard did not match petitioner's fingerprint; (6) petitioner testified that he had been in West's car on the night of the crime and exited the vehicle at the scene of the crime; (7) petitioner provided a police statement and also testified that he shot the gun that West handed him, but said it was a .22 caliber gun and that he fired the gun into the air; (8) ballistics evidence showed that the bullet that killed Beard was fired from West's Ruger 9mm; (9) no .22 caliber gun was ever recovered, and no .22 caliber casings were found at the crime scene; (10) West testified that he did not own a .22 caliber gun; and (11) nobody, including petitioner, testified that anyone else in West's car fired a gun.

15

In addition, the trial judge gave the following general instruction on the credibility of witnesses: "You are the sole judge of the credibility of each witness including the defendant and of the weight to be given to the testimony of each. You should take into consideration each witness' means of knowledge; strength of memory and opportunity for observation; the reasonableness or unreasonableness of his/her testimony; the consistency or inconsistency of his/her testimony; the motives actuating him/her; the fact, if it is a fact, that his/her testimony has been contradicted; his/her bias, prejudice, or interest, if any; his/her manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affect the credibility of his/her testimony." *Hoskins*, 14 A.3d at 560 n.18. The trial judge also gave the following instruction on conflicts in testimony: "If you find the testimony to be conflicting by reason of inconsistencies, it is your duty to reconcile it, if reasonably possible, so as to make one harmonious story of it all. But, if you cannot do this, then it is your duty and privilege to give credit to that portion of the testimony which, in your judgment, is unworthy of credit. In so doing, you should take into consideration the demeanor of the witnesses as they testified before you, their apparent fairness in giving their testimony, their opportunities for learning and knowing the facts about which they testified, and any bias or interest that they may have concerning the outcome of this case." (D.I. 16, Appellant's Op. Br. in *Hoskins v. State*, No. 98,2009, Exh. 5 at 31)

The record also reveals that defense counsel cross-examined West about the gun he owned, and about inconsistencies between West's first and second police statements about who was in his car on the night of the crime and whether he let someone use his gun. (D.I. 16, Appellant's App. in *Hoskins v. State*, No. 98,2009, at A-

22 to A-24) For instance, defense counsel asked West about the following inconsistency: "In September of 2008 your statement mentioned nothing about [petitioner] asking you to get your gun from 46 Glenn Street. A year later, with a plea offer on the table, all of sudden he's asked you that. Can you explain the inconsistency?" (D.I. 16, Appellant's App. in *Hoskins v. State*, No. 98,2009, at A-53) West replied, "I told him exactly what happened." *Id.* Finally, during his closing argument, defense counsel explicitly focused on West's credibility by asking, "why would Alonzo plead guilty to murder in the second degree, given what you heard from his testimony?" (D.I. 16, Appellant's App. in *Hoskins v. State*, No. 98,2009, at A-117)

After considering the totality of the evidence at trial, the general jury instruction on credibility, the general jury instruction on conflicts in testimony, and defense counsel's ability to argue the issues of credibility and conflicts to the jury, the court concludes that petitioner has failed to show a reasonable probability that the result of the proceeding would have been different if the jury had been instructed to view West's testimony with caution and suspicion. Because the jury had sufficient evidence to assess West's credibility, the Delaware Supreme Court's ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Accordingly, the court will deny claim one for failing to satisfy § 2254(d)(1).

17

## B. Claim Two: Counsel Failed To Request A Single Theory Unanimity Jury Instruction

In *Probst v. State*, 547 A.2d 114 (Del. 1988), the Delaware Supreme Court

opined:

> A **general** unanimity instruction is required in every criminal case. However, this Court does not hold that a specific unanimity instruction is required in every case where a defendant may be convicted as a principal or as an accomplice. In fact, this Court recognizes that even when principal and accomplice liability theories are advanced, a general unanimity instruction is usually sufficient. In the absence of a defense request for a specific instruction or in the absence of unusual circumstances creating a potential for confusion e.g., alternative incidents which subject the defendant to criminal liability.
>
>      \*               \*               \*
>
> The need for a specific unanimity instruction flows from the fact that the basis for liability stems from two separate incidents and not from the applicability of principal or accomplice liability with respect to one of the two incidents. The necessity for a specific unanimity instruction under a single count of an information or indictment depends upon whether each act or theory under the count involves a separately cognizable incident, e.g., by reference to separate allegations and/or to separate defenses.

*Probst*, 547 A.2d at 121-22 (emphasis in original) (internal citations omitted). In sum, a

"more specific unanimity instruction is required if (1) a jury is instructed that the

commission of any one of several alternative actions would subject the defendant to

criminal liability, (2) the actions are conceptually different, and (3) the state has

presented evidence on each of the alternatives." *Id.* at 121.

In his direct appeal, petitioner argued that the trial court should have provided a

single unanimity instruction. The Delaware Supreme Court rejected this argument for

the following reason:

> We conclude that the second *Probst* circumstance was not present because the facts of this case do not present the kind of "conceptually different" or "distinct"

18

actions involved in *Probst*. [] Although the shooting here involved multiple guns, police determined that one gun – West's Ruger 9mm – delivered the fatal shot. Unlike the "unusual facts and circumstances" of *Probst*, this case turned on the identity of the person who fired the Ruger 9mm, not the identity of the shooter and the gun amid two separate incidents. Accordingly, there was no potential for jury confusion.

*Hoskins*, 14 A.3d at 564-65. On post-conviction appeal, petitioner argued that defense

counsel's failure to request a single unanimity instruction amounted to ineffective

assistance. The Delaware Supreme Court denied this argument for the following

reason:

> We explained in *Probst v. State* that a general unanimity instruction is typically sufficient to insure that the jury is unanimous on the factual basis for conviction. In [petitioner's] direct appeal, we held the single theory unanimity instruction was not warranted by the circumstances because there was no potential for jury confusion. Because there was no need to issue a single theory unanimity instruction, trial counsel's failure to request one cannot be error under the law of the case doctrine. Likewise, there can be no prejudice resulting therefrom.

*Hoskins*, 102 A.3d at 733.

Now, in claim two of this proceeding, petitioner contends that defense counsel

provided ineffective assistance by failing to request a single theory unanimity instruction

pursuant to *Probst*. The court is not persuaded. First, on habeas review, the court must

accept the Delaware Supreme Court's interpretation and application of Delaware state

law as set forth in *Probst.* Second, given petitioner's failure to provide clear and

convincing evidence to the contrary, the court must defer to the Delaware Supreme

Court's factual finding that the circumstances of petitioner's case did not warrant a

single theory unanimity jury instruction. Considering the Delaware Supreme Court's

determination that a single theory unanimity jury instruction was not warranted in

petitioner's case, the court concludes that defense counsel's failure to request such a

19

jury instruction did not constitute ineffective assistance. *See United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999). Therefore, the court will deny claim two.

### C. Claim Three: Counsel Failed To Object To The Admission Of West's Out-Of-Court Statements

In his final claim, petitioner contends that defense counsel provided ineffective assistance by failing to object to the State's failure to comply with the requirements of 11 Del. C. § 3507 when admitting West's two recorded out-of-court statements as evidence. For instance, during petitioner's first trial, the State made the following attempt to satisfy § 3507:

Q: Did you also agree at the time of your plea that the statements you gave to the police were truthful?

A: Yes.

At petitioner's second trial, the State made the following attempt to satisfy § 3507:

Q: Did you also agree at the time of your plea that the statements you gave to the police were truthful, those two prior statements that you had given?

A: Yes.

*Hoskins*, 14 A.3d at 555.

On direct appeal, the Delaware Supreme Court acknowledged that the prosecutor's questions could have been phrased better by presenting it in the following form: "is the content of the statement you gave true?" *Hoskins*, 14 A.3d at 566. However, the Delaware Supreme Court also explained that it could not conclude that "the prosecutor's question was so different from the preferred technically correct inquiry

20

as to be clearly prejudicial to [petitioner's] substantial rights so as to jeopardize the

fairness and integrity of the trial process," and held that petitioner failed to demonstrate

plain error under the circumstances of the case. Id.

On post-conviction appeal, the Delaware Supreme Court denied claim three after

determining that defense counsel's failure to object to the admission of West's

statements did not rise to the level of ineffective assistance, explaining that:

> On direct appeal, we held that the trial court did not commit plain error in
> admitting the out of court statements as evidence. But this does not mean that
> counsel's representation was per se effective. The relevant question under the
> first prong of Strickland is whether trial counsel's failure to object to its
> admissibility was so erroneous as to overcome the "strong presumption" that trial
> counsel's representation was professionally reasonable. As noted in the direct
> appeal, the prosecutor could have worded his questions better.
>
> Although trial counsel failed to object to the prosecutor's perhaps awkward
> attempt to comply with his obligation under § 3507, trial counsel may well have
> recognized that a technical objection was unlikely to help his client. [Petitioner]
> argues that his trial counsel should have objected because the prosecutor's
> questions were not precise enough, and did not focus on whether West's prior
> testimony was truthful, not just when given, but whether it remained truthful. Had
> his trial counsel objected to the prosecutor's awkward but harmless form of
> questioning on this basis, as [petitioner] claims he should have done, West would
> presumably have affirmed that his prior statements were still truthful, both
> because he took an oath to tell the truth before he testified at trial, and because
> his current testimony was consistent with his prior testimony. Thus, [petitioner]
> has not shown that trial counsel's failure to object constituted a Strickland
> violation at all, and, in any event, has not demonstrated prejudice. And absent
> any prejudice to the defendant, we will not review as an abuse of discretion a trial
> court's decision to admit evidence based upon the technical requirements of
> § 3507. In sum, there are insufficient grounds in the record to overcome the
> presumption of trial counsel's reasonableness.

Hoskins, 102 A.3d at 734-35.

In this proceeding, petitioner has failed to establish how defense counsel's

objection to the admission of the statements could have changed the truthfulness of the

statements and how that change would have affected the outcome of his case,

21

especially since West agreed that the statements were truthful when given and he

testified under oath at trial consistent with those statements. Thus, after viewing the

Delaware Supreme Court's decision through the doubly deferential lens applicable on

federal habeas review, the court concludes that the Delaware Supreme Court's ruling

was not "so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement."

*Richter*, 562 U.S. at 103. Accordingly, the court will deny claim three for failing to satisfy

§ 2254(d)(1).

## V. CERTIFICATE OF APPEALABILITY

The court must decide whether to issue a certificate of appealabilty. *See* 3d Cir.

L.A.R. 22.2 (2011). The court may issue a certificate of appealability only when a

petitioner makes a "substantial showing of the denial of a constitutional right." 28

U.S.C. § 2253(c)(2). This showing is satisfied when the petitioner demonstrates "that

reasonable jurists would find the district court's assessment of the denial of a

constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

For the reasons stated above, the court concludes that petitioner's habeas

application must be denied. Reasonable jurists would not find this conclusion

debatable. Consequently, petitioner has failed to make a substantial showing of the

denial of a constitutional right, and a certificate of appealability will not be issued.

## VI. CONCLUSION

For the foregoing reasons, the court will deny petitioner's application for habeas

relief filed pursuant to 28 U.S.C. § 2254. An appropriate order will be entered.

22